COLORADO COURT OF APPEALS                                    2017COA90

Court of Appeals No. 16CA0448
Arapahoe County District Court No. 13CV30674
Honorable Kurt A. Horton, Judge

Shawn Sovde, a minor, by and through his mother and next friend, Katrina
Kinney,

Plaintiff-Appellant,

v.

Kevin Scott, D.O.; and Andrew Sarka, M.D.,

Defendants-Appellees.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE BERNARD
Dailey and Fox, JJ., concur

Announced June 29, 2017

Andrew T. Brake, P.C., Andrew T. Brake, Englewood, Colorado, for Plaintiff-
Appellant

Hershey Decker, PLLC, C. Todd Drake, Lone Tree, Colorado, for Defendants-
Appellees

¶ 1 Colorado's Rules of Civil Procedure require parties to lawsuits to endorse expert witnesses and to inform each other of the substance of the expert witnesses' testimony. But what happens if one party withdraws an endorsed "may call" expert witness shortly before trial or during trial, and the opposing party then announces that it wants to call the withdrawn witness to testify? We conclude that, to answer this question, a trial court should, in the exercise of its discretion, balance factors such as (1) whether the expert's testimony would be cumulative; (2) whether excluding the expert's testimony would result in unfair prejudice to the nonendorsing party; and (3) whether the nonendorsing party did not endorse its own expert on the subject, because the absence of such an endorsement would suggest an attempt to "piggyback" on the endorsing party's preparation.

¶ 2 This question arose in the context of a medical malpractice case. Plaintiff, a child, Shawn Sovde, by and through his mother, Katrina Kinney, sued defendants, Dr. Andrew Sarka and Dr. Kevin Scott. The jury found in defendants' favor. Plaintiff appeals. We affirm.

## I.     Background

¶ 3     The child was born on June 25, 2006.  Shortly after his birth, his mother noticed a "scrape" or a "lesion" on "the top of his head" and marks by his ears.  She noticed "more lesions" on him the next day.

¶ 4     Dr. Sarka examined the child on the day after he was born, and Dr. Scott examined him the day after that.  Dr. Scott told the mother that the lesions were "baby acne" and "cradle cap."  He repeated these observations when he examined the child three days later.  Neither doctor took any action or ordered additional testing concerning the lesions during the week after the child was born.

¶ 5     The child's behavior changed on July 4, or nine days after his birth.  The mother later testified that he "was not eating as well" as he had earlier, and that he was "[m]uch sleepier."  The lesions on his head were "getting bigger," and they were spreading.

¶ 6     The next day, based on a pediatrician's advice, the mother and the child's father, Raymond Sovde, rushed the child to the hospital.  Once there, doctors determined that the child had been infected with the herpes simplex virus, which had manifested itself in two

ways: skin, eyes, and mucous membrane (SEM) disease, and central nervous system (CNS) disease.

¶ 7 The doctors at the hospital immediately began to treat the child with antibiotics, which they repeated over time. But the CNS disease had done serious damage, eventually inducing seizures and causing a sensory processing disorder. And some of the medicine that the doctors prescribed for the child caused other medical problems, such as pancreatitis.

¶ 8 The child's lawsuit claimed that

- defendants had negligently misdiagnosed the child's lesions as something benign instead of manifestations of the herpes simplex virus, even though, plaintiff alleged, the child had herpes-caused lesions on his head on the day that he was born; and

- if defendants had timely and properly diagnosed the lesions as products of less harmful SEM disease, they could have treated the child with antibiotics, which could have prevented the onset of the more harmful CNS disease.

¶ 9 Defendants countered that

- the child had developed the two forms of herpes-related disease simultaneously on July 4 or 5, and that the lesions that the mother had seen on him on the day of his birth had not been herpes-related; so

- they were not negligent because they could not have diagnosed any herpes-related disease before July 4 or 5.

¶ 10    The case proceeded to trial.  The jury found that defendants had not been negligent.

¶ 11    Plaintiff raises two contentions on appeal.

¶ 12    First, he asserts that the trial court erred when it denied related requests concerning two of defendants' previously endorsed expert witnesses whom defendants had withdrawn.  Plaintiff wanted to call them to testify, or to use their depositions to cross-examine defendants' other experts.

¶ 13    Second, he contends that the trial court erred when it excluded certain testimony because it was hearsay.

## II.    Withdrawn Expert Witnesses

### A.    Additional Background

¶ 14    Defendants endorsed several expert witnesses more than three months before trial.  One of them, Dr. Thomas Reiley, was a

neurologist. Another, Dr. Richard Molteni, was a pediatrician and a neonatologist. The endorsement described them as "Specially Retained Expert Witnesses Who May be Called to Testify During the Hearing in this Matter."

¶ 15 Plaintiff did not endorse Dr. Reiley or Dr. Molteni. But he reserved the right "to call any witnesses listed by . . . [d]efendants and any rebuttal or impeachment witnesses as may be deemed necessary, at the conclusion of [d]efendants' case."

¶ 16 About six weeks before trial, defendants designated the two expert witnesses as "may call" witnesses on their witness list. (C.R.C.P. 16(f)(3)(VI)(A) distinguishes between "may call" and "will call" witnesses. "If a party lists a witness as a 'will call' witness, that party 'must ensure' that the witness will be available to testify at trial if called by any party without the necessity of another party serving a subpoena on the witness." 6 David R. DeMuro, *Colorado Practice Series: Civil Trial Practice* § 9.4, Westlaw (database updated Aug. 2016). As we explain in more detail below, there is no such requirement for "may call" witnesses.)

¶ 17 Eleven days before trial, defendants filed a motion stating that they would not call Dr. Reiley at trial. They asked the trial court to

exclude all of his "[d]eposition testimony, handwritten notes, and literature" from the trial.

¶ 18    The next day, plaintiff updated his witness list to include Dr. Reiley, and he served him with a subpoena.

¶ 19    After a hearing, the trial court ruled that plaintiff could not call Dr. Reiley as his witness and that plaintiff could not refer to his deposition or expert report. The court observed that defendants had listed him as a "may call" witness and that they were "entitled to withdraw [him] as an expert witness. They have done so somewhat belatedly but have done so."

¶ 20    The court did not anticipate that plaintiff would be prejudiced if he could not call Dr. Reiley to the stand. "Among other things, [he has his] own expert in pediatric neurology endorsed to testify in this case as well as a number of other witnesses."

¶ 21    Near the end of defendants' case-in-chief, they said that they would not call Dr. Molteni to testify. Plaintiff asked the court to allow him to call Dr. Molteni as his own rebuttal witness or to allow him to read Dr. Molteni's deposition to the jury. Plaintiff claimed that his opinions "very much rebut[ted]" other defense expert opinions.

¶ 22    Citing its previous ruling about Dr. Reiley, the court denied plaintiff's request. Although it acknowledged that it was "somewhat sensitive to the fact that [defendants were] doing this late," the court explained that plaintiff should have endorsed Dr. Molteni as his own witness if he had planned to rely on his opinions in rebuttal.

¶ 23    The court did, however, allow plaintiff to use Dr. Reiley's and Dr. Molteni's opinions in hypothetical questions for cross-examining some of defendants' other expert witnesses. But the court, citing "strong public policy reasons," added that plaintiff could not name these experts or suggest that the hypotheticals had come from the opinions of defendants' formerly endorsed expert witnesses.

### B.    Standard of Review

¶ 24    Trial courts have broad discretion to admit or to exclude expert testimony, *Estate of Ford v. Eicher*, 220 P.3d 939, 942 (Colo. App. 2008), *aff'd*, 250 P.3d 262 (Colo. 2011), and to permit "late identified witnesses to testify," *Dare v. Sobule*, 648 P.2d 169, 171 (Colo. App. 1982), *rev'd on other grounds*, 674 P.2d 960 (Colo. 1984). A trial court abuses its discretion if its ruling is manifestly

7

arbitrary, unreasonable, or unfair, or if it applies an incorrect legal standard. *Estate of Ford*, 220 P.3d at 942.

C.     Applicable Rules

¶ 25     Colorado's civil rules require each party to disclose to the opposing party the identity and expertise of any person who may present evidence at trial. C.R.C.P. 26(a)(2)(A); *see also* C.R.C.P. 26(a)(2)(B) (requiring parties to disclose retained experts via a written and signed report).

¶ 26     A different rule requires each party to file a "proposed trial management order" at least twenty-eight days before trial, identifying the witnesses whom it "will call" and the witnesses whom it "may call." C.R.C.P. 16(f)(3)(VI)(A).

> When a party lists a witness as a "will call" witness, the party does not have to call the witness to testify, but must ensure that the witness will be available to testify at trial if called by any party without the necessity for any other party to subpoena the witness for the trial.

*Id.* The rule does not contain similar requirements for "may call" witnesses. *See id.*

¶ 27     This lack of a parallel requirement has meaning because we cannot "add words" to a court rule. *See Boulder Cty. Bd. of*

8

*Comm'rs v. HealthSouth Corp.*, 246 P.3d 948, 951 (Colo. 2011)("We do not add words to a statute."); *see also Leaffer v. Zarlengo*, 44 P.3d 1072, 1078 (Colo. 2002)(noting that standard principles of statutory construction apply to the interpretation of court rules). Applying de novo review, *see Gleason v. Judicial Watch, Inc.*, 2012 COA 76, ¶ 14 (interpreting court rules is a question of law that appellate courts review de novo), we conclude that the presence of the requirement for "will call" witnesses in C.R.C.P. 16(f)(3)(VI)(A), and the absence of the requirement for "may call" witnesses in that rule, indicates that the supreme court, in promulgating the rule, made a deliberate choice, *see BSLNI, Inc. v. Russ T. Diamonds, Inc.*, 2012 COA 214, ¶ 9 (using standard statutory construction principles in evaluating the Colorado Rules of Civil Procedure); *cf. People v. Seacrist*, 874 P.2d 438, 440 (Colo. App. 1993)(Appellate courts apply "the presumption that the General Assembly was aware that qualifying language could be added to limit application of the statute . . . and that it would have done so if such had been its intent."). We conclude that the deliberate choice of the supreme court was to eschew placing a responsibility on parties to make

their "may call" witnesses available at trial if they decide that they do not want to call those witnesses to testify.

¶ 28      C.R.C.P. 16 also requires parties to, at least twenty-eight days before trial, identify the depositions of any witness that they may use at trial. C.R.C.P. 16(f)(3)(VI)(D) ("If the preserved testimony of any witness is to be presented the proponent of the testimony shall provide the other parties with its designations of such testimony at least 28 days before the trial date.").

### D.    Application

¶ 29      Plaintiff's contention is multifaceted. First, he appears to assert that the trial court should not have allowed defendants to withdraw Dr. Reiley and Dr. Molteni past the trial management deadline. Second, he submits the court should have permitted him to call the doctors to testify after defendants had withdrawn them or permitted him to use their depositions to cross-examine other expert witnesses. We disagree with both facets of this contention.

### 1.    The Trial Court Properly Permitted Defendants to Withdraw Dr. Reiley and Dr. Molteni as Witnesses

¶ 30      To begin, defendants designated both Dr. Reiley and Dr. Molteni as "may call" experts at least twenty-eight days before trial

to comport with C.R.C.P. 16(f)(3)(VI)(A). Defendants also complied with C.R.C.P. 26 because they disclosed the two doctors as experts that they "may" call. *See* C.R.C.P. 26(a)(2)(A).

¶ 31 We are not aware of any Colorado rule or holding — and plaintiff does not cite any — that requires a party to call each witness on its witness list. Some cases have expressly rejected such a rule. *See Warren v. People*, 121 Colo. 118, 123, 213 P.2d 381, 384 (1949)("[T]he district attorney is under no obligation to call all witnesses whose names are endorsed on the information."); *see also United States v. Bond*, 552 F.3d 1092, 1097 (9th Cir. 2009)("[I]t is elementary that litigants are not *required* to call every witness identified on their witness lists. The witness list simply provides notice to the court and to opposing counsel of the witnesses who *may* be presented at trial.").

¶ 32 In the absence of any authority holding otherwise, we conclude that the trial court did not abuse its discretion when it permitted defendants to withdraw Dr. Reiley and Dr. Molteni. We also conclude, for the reasons that we explained above, that defendants did not have an obligation to make them available at

trial to testify because defendants had designated them as "may call" witnesses, not "will call" witnesses.

### 2. The Trial Court Did Not Abuse Its Discretion When It Denied Plaintiff's Request to Call Dr. Reiley and Dr. Molteni to Testify or to Use Their Depositions

¶ 33 Plaintiff did not comply with C.R.C.P. 26 because he did not timely endorse Dr. Reiley or Dr. Molteni. He also did not inform the court and defendants that he would use their depositions at trial under C.R.C.P. 16(f)(3)(VI)(D).

¶ 34 In exercising its broad discretion to reject plaintiff's request "to endorse witnesses after the date permitted by rule," *Brown v. Hollywood Bar & Cafe*, 942 P.2d 1363, 1365 (Colo. App. 1997), the trial court pointed out that plaintiff had not informed the court he would rely on the expert opinions of Dr. Reiley and Dr. Molteni. The court also observed that plaintiff had endorsed several of his own experts with similar expertise. *See, e.g.*, *People v. Carmichael*, 179 P.3d 47, 55 (Colo. App. 2007)("Because Carmichael's late endorsement violated the discovery rules, and he failed to articulate a reason why it was so late, we perceive no abuse of discretion by the court in imposing a sanction and disallowing the testimony of the defense witness."), *rev'd on other grounds*, 206 P.3d 800 (Colo.

12

2009); *Brown*, 942 P.2d at 1365)(concluding that the trial court did not abuse its discretion when it barred witnesses from testifying who had not been timely endorsed).

¶ 35    Notwithstanding plaintiff's untimely endorsements of the doctors and requests to use their depositions, he asserts that, "once a party endorses an expert, the expert has been deposed, and the parties are engaged in final trial preparation," "it is too late to prohibit an opposing party from calling the expert." Even if we assume that plaintiff's untimely endorsements were insufficient to support the trial court's decision to bar Dr. Reiley and Dr. Molteni from testifying, we still conclude that the trial court did not abuse its discretion.

¶ 36    C.R.C.P. 26 and its federal counterpart are silent about whether a party may call an opposing party's expert witness once the opposing party has withdrawn the expert. *See Ferguson v. Michael Foods, Inc.*, 189 F.R.D. 408, 409 (D. Minn. 1999); *McClendon v. Collins*, 372 P.3d 492, 494 (Nev. 2016)("[T]he rules of civil procedure are silent as to whether an opposing party may depose or call as a witness an expert who had been designated as

one who will testify at trial but was then later de-designated.").

Colorado appellate courts have not addressed this question.

¶ 37    Courts outside of Colorado have used a "discretionary" or "balancing" approach to determine whether one party may call the opposing party's withdrawn expert. *See House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 242-47 (N.D. Iowa 1996)(describing the discretionary or balancing approach and applying it in that case); *see also Peterson v. Willie*, 81 F.3d 1033, 1037-38, 1038 n.4 (11th Cir. 1996)(explaining that once an expert is withdrawn by one party, the court has discretion to permit the opposing party to call the expert); *McClendon*, 372 P.3d at 494 (noting that the discretionary standard is the "proper standard" to determine whether a "de-designated" expert may testify for the opposing party)(citation omitted).

¶ 38    A court applying this balancing test weighs factors such as whether the expert's testimony would be cumulative, thus limiting the testimony's probative value; whether excluding the expert's testimony would result in unfair prejudice; and whether the opposing party failed to endorse its own expert, thereby

demonstrating an attempt to "piggyback" on the other party's preparation. *McClendon*, 372 P.3d at 495.

¶ 39 Courts adopting the balancing test also recognize that the party that *originally* endorsed the expert witness can suffer prejudice if the opposing party calls the withdrawn expert to testify. For example, "[j]urors unfamiliar with the role of counsel in adversary proceedings might well assume that [a party's] counsel had suppressed evidence which he had an obligation to offer [when the party withdrew an expert witness.] Such a reaction could destroy counsel's credibility in the eyes of the jury." *Peterson*, 81 F.3d at 1037 (quoting *Granger v. Wisner*, 656 P.2d 1238, 1242 (Ariz. 1982)). Another court described this sort of prejudice as "explosive." *Rubel v. Eli Lilly & Co.*, 160 F.R.D. 458, 460 (S.D.N.Y. 1995)(consulting expert witness context; the expert at issue was not designated by the hiring party to testify); *see also* Damian D. Capozzola, *Expert Witnesses in Civil Trials* § 8:27, Westlaw (database updated Sept. 2016)("[T]here should be a presumption against a party being able to call at trial an expert originally retained by the other party, a presumption that can only be overcome by a showing of exceptional circumstances, or by

prophylactic measures taken by the [c]ourt to ensure that the other party is not unduly prejudiced. Indeed, a number of courts have held that a party may not use the deposition of an opponent's withdrawn expert.").

¶ 40 Our review of the record indicates to us that the trial court applied the balancing test described in cases such as *House* and *Peterson*. Indeed, in its order denying plaintiff's motion for a new trial, the court cited those two cases.

¶ 41 As well, during the trial, the court explained that

- "there has been no reliance by [plaintiff] on the endorsement of Dr. Reiley. There's no specific cross endorsement for Dr. Reiley or otherwise an indication sufficient to the [c]ourt that [plaintiff was] relying upon Dr. Reiley being present";

- "there should be no prejudice to [plaintiff if the court does not allow him to call Dr. Reiley to testify]. Among other things, [he has his] own expert in pediatric neurology endorsed to testify in this case as well as a number of other witnesses"; and

- Dr. Reiley's testimony would be "duplicative."

16

¶ 42    The court relied on the same reasoning to deny plaintiff's request to call Dr. Molteni to testify or to use his deposition. And the court reiterated these same reasons when it denied plaintiff's motion for a new trial.

¶ 43    The record does not include trial transcripts of the testimony of the expert witnesses whom plaintiff called to testify at trial. So we must presume that the missing transcripts supported the trial court's decision. *See In re Marriage of Cardona*, 321 P.3d 518, 526 (Colo. App. 2010), *aff'd on other grounds*, 2014 CO 3.

¶ 44    Plaintiff next asserts that Dr. Reiley and Dr. Molteni held opinions that were inconsistent with the opinion of a third expert witness whom defendants called to testify at trial. (This witness, Dr. Michael Radetsky, was a pediatrician who had expertise in pediatric infectious diseases.) The trial court's order barring Dr. Reiley and Dr. Molteni from testifying was, plaintiff continues, therefore unjust.

¶ 45    The record contains Dr. Reiley's and Dr. Molteni's depositions and reports and the testimony of Dr. Radetsky. Contrary to plaintiff's assertion, our review of the record shows only small differences among these various sources of expert opinion. For

17

example, Dr. Reiley offered the opinion that babies who contract SEM disease will eventually develop CNS disease in about seventy percent of cases; Dr. Radetsky did not "know the derivation" of this statistic. Dr. Reiley thought that the incubation period for the herpes simplex virus was two to twelve days after birth; Dr. Radetsky said the timeframe could vary if babies were inoculated against the virus at birth.

¶ 46 Pointing out these differences would not have furthered plaintiff's case very much. For example, Dr. Reiley's opinion about the timeframe when herpes-related lesions could appear — two to twelve days after birth — was *consistent* with defendants' position at trial that the child's herpes-related lesions appeared nine or ten days after he was born.

¶ 47 True enough, Dr. Molteni thought that herpes-related lesions would "crust over" in five to seven days, while Dr. Radetsky said that the crusting process moved more quickly. Medical charts in the record show that, when the child was admitted to the hospital on July 5, he had crusted lesions on his nose, his neck, and his chest. So Dr. Molteni's opinion that lesions take several days to

18

crust would have supported plaintiff's theory that the child had SEM disease *before* July 4 or 5.

¶ 48     But plaintiff had also endorsed a second neurologist, Dr. Dinesh Talwar, who expressed substantially the same opinion as Dr. Molteni. (Recall that the record does not contain any of the testimony of plaintiff's experts. But it includes Dr. Talwar's expert disclosure.) Dr. Talwar indicated that "[s]kin lesions of herpes develop and evolve over a period of time." The child's lesions "likely developed over a period of 5 to 10 days, and it would be highly unlikely that they developed over only 2 days." So the record shows that Dr. Talwar could have made the same point as Dr. Molteni.

¶ 49     Given all of this, we conclude that the record supports the trial court's implicit decision that Dr. Reiley's and Dr. Molteni's testimony and the depositions would have been cumulative or would have had little probative value. *See House*, 168 F.R.D. at 246; *McClendon*, 372 P.3d at 495 ("In applying [the *House*] balancing test, courts have considered such factors as whether the testimony would be duplicative or cumulative of other witnesses' testimony, thus limiting the probative value of that testimony."); *cf. Rubel*, 160 F.R.D. at 460-61 ("[I]t appears to us that the substance

of Dr. Hembree's proposed testimony, even giving the plaintiff the benefit of the doubt, would overlap very substantially [with] the testimony of plaintiff's other witnesses. In consequence, the evidence in question appears to be cumulative save, of course, for the fact that Dr. Hembree was retained in the first instance by Lilly.")(footnote omitted).

¶ 50 We further conclude that plaintiff was not unfairly prejudiced by the trial court's decision to exclude this testimony. He did not endorse Dr. Reiley and Dr. Molteni in a timely fashion, even though he had deposed them and he had learned of the substance of their expert opinions well in advance of trial. We therefore reject plaintiff's assertions that he had reasonably relied on the prospect that defendants would call Dr. Reiley and Dr. Molteni to testify — even though they were designated as "may call witnesses" — and that these witnesses' expert opinions were critical to his case. *Cf. Rubel,* 160 F.R.D. at 462 ("Nor can plaintiff fairly be heard to argue that she relied upon the ability to obtain the evidence from Dr. Hembree. She did not list Dr. Hembree as a trial witness in the pretrial order."). And the prospect that plaintiff was prejudiced is further undercut by the trial court's decision to allow him to cross-

examine Dr. Radetsky about Dr. Reiley's and Dr. Molteni's opinions in the form of hypotheticals.

¶ 51     In summary, we conclude that the trial court properly applied the balancing approach described in *House, Peterson,* and *McClendon.* We further conclude that the court did not abuse its discretion when it denied plaintiff's requests to call Dr. Reiley and Dr. Molteni at trial or to use their depositions. We last conclude, for these same reasons, that the court properly rejected plaintiff's motion for a new trial. *See, e.g., Acierno v. Garyfallou,* 2016 COA 91, ¶ 40 (concluding that the trial court did not abuse its discretion in denying a motion for a mistrial, and for the same reasons, it did not abuse its discretion in denying a request for a new trial on the same grounds).

### III.    Hearsay Testimony

#### A.    Additional Background

¶ 52     Concerned about the child's changing behavior on July 4, the father telephoned a friend who was a licensed medical assistant in a pediatrician's office.

¶ 53     At trial, plaintiff sought to offer the medical assistant's testimony repeating what the child's father had said during the

21

telephone call. He argued that this testimony was admissible under CRE 803(4) because the father's statements were made for purposes of medical diagnosis or treatment. As plaintiff's counsel explained,

> [the medical assistant] was – if you will, an extension of [the pediatrician's] office. The call was made to make an appointment to see a physician. And if I – my recollection is correct – I believe it is – it was also to get her advice as to what they should do from a medical standpoint for [the child], knowing she's in the medical field.

¶ 54    The medical assistant said during an offer of proof that she knew that the child's father had called her for "[m]edical help."

> A.    [The father] had told me that . . . they were having to wake [the child] up to feed him, that he was having a difficult time feeding. He had the blisters on his head, that [he] and [the child's mother] didn't believe the doctor was correct in his assessment, and they wanted a second opinion. And they were really worried about him.
>
> And I told him that, you know, to continue to wake up [the child] in the middle of the night. And I would give him a call first thing in the morning after I talked to [the pediatrician for whom she worked], and I would get an appointment to come in and see us.
>
> Q.    So did you, in fact, give them medical advice yourself in terms of what to do and when to come in?
>
> A.    Correct.

22

Q. And did you then understand this was, in effect, their reaching out to you as someone in the medical community that they knew who might try to help them because what they were being told by their doctor simply wasn't satisfying?

A. Correct.

¶ 55 Plaintiff also wanted to introduce the medical assistant's statements to the pediatrician for whom she worked, repeating what the child's father had said during the telephone call. And he wanted to present this same testimony through the child's mother, who had been in the room when the father had called the medical assistant.

¶ 56 The trial court excluded this testimony during the trial, ruling that it was inadmissible hearsay. The court stood by this decision in its order denying plaintiff's motion for a new trial.

## B. Standard of Review

¶ 57 We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See Mullins v. Med. Lien Mgmt., Inc.*, 2013 COA 134, ¶ 35. A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair, or if the court

misapplies the law. *Freedom Colo. Info., Inc. v. El Paso Cty. Sheriff's Dep't*, 196 P.3d 892, 899 (Colo. 2008).

¶ 58 But, even if the trial court abused its discretion when it excluded the evidence in this case, we will only reverse the judgment if we can say "with fair assurance" that the error "substantially influenced the outcome of the case or impaired the basic fairness of the trial itself." *Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, 2012 COA 120, ¶ 29 (citations omitted); *see In re Estate of Fritzler*, 2017 COA 4, ¶ 7 (noting that an appellate court will not reverse a judgment if the trial court's decision to exclude the evidence was harmless).

## C. Law

¶ 59 Hearsay "is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). As a general rule, hearsay is not admissible. But there are exceptions in rules and statutes. *See* CRE 802.

¶ 60 Statements made for the purpose of medical diagnosis or treatment are exempted from the rule prohibiting hearsay. *See* CRE 803(4). For this type of evidence to be admissible, it must (1) be

24

made for purposes of medical diagnosis or treatment; (2) describe medical history, symptoms, or the inception or cause of symptoms; and (3) be reasonably pertinent to diagnosis or treatment. *Kelly v. Haralampopoulos*, 2014 CO 46, ¶ 20. But statements ascribing fault are generally not admissible under CRE 803(4), unless the statements of fault are "necessary for diagnosis and treatment." *People v. Allee*, 77 P.3d 831, 834 (Colo. App. 2003).

### D. Application

¶ 61 The father's statements to the medical assistant fall into two broad categories: (1) statements describing the child's symptoms; and (2) statements expressing dissatisfaction with the care that defendants had given him.

¶ 62 The latter category of statements clearly does not fall under CRE 803(4). These statements ascribed fault to defendants, and they were not necessary to assist in the diagnosis and treatment of the child's condition. *See id.*

¶ 63 But we conclude that the former set of statements fell within the ambit of CRE 803(4) because the father provided them to the medical assistant to obtain a diagnosis of and treatment for the child's condition; they described his symptoms and his medical

25

history; and they were obviously pertinent to the diagnosis and treatment of his condition. *See Kelly*, ¶ 20.

¶ 64    Even so, we cannot say with fair assurance that excluding this testimony substantially influenced the basic fairness of the trial, *see Estate of Fritzler*, ¶ 7; *Core-Mark Midcontinent, Inc.*, ¶ 29, because other witnesses testified about the child's symptoms and conditions on July 4.

- The child's mother testified that, on that day, he did not eat "as well" and that he was "much sleepier," even "lethargic." The mother and the father had to wake him to feed him through the "afternoon, evening, and . . . night." "He was not eating much, and he was not waking up on his own to eat."

- The mother said that the lesions on the child's head "were certainly getting bigger" on July 4, and that other lesions were spreading to his nose and chest.

- A defense expert repeated the mother's observations that the child had been lethargic and that he had not eaten normally on July 4.

26

¶ 65    "If evidence that is excluded was also presented through other testimony or admitted evidence, any error in excluding the cumulative evidence is harmless and does not constitute reversible error." *Fritzler*, ¶ 12. Because the substance of the statements that the father made to the medical assistant was admitted through other witnesses, we conclude that plaintiff was not harmed by the trial court's decision to exclude the medical assistant's testimony.

¶ 66    In reaching this conclusion, we note that defendants did not contest the testimony about the child's July 4 symptoms. Their position was, instead, that the child had developed the herpes-related lesions on July 4 or 5 *after* they had examined him.

¶ 67    Since this error was harmless, then, by a parity of reasoning, any error that the trial court may have made in preventing the medical assistant from testifying about her statements to the pediatrician repeating what the father had said during the telephone call or in preventing the mother from testifying about the father's statements was also harmless.

¶ 68    And, based on these conclusions, we further conclude that the trial court did not abuse its discretion when it denied plaintiff's motion for a new trial on these grounds. *See Acierno*, ¶ 40.

¶ 69     The judgment is affirmed.

JUDGE DAILEY and JUDGE FOX concur.