United States Court of Appeals, Eleventh Circuit.

No. 94-4608.

Mariann PETERSON, as Guardian of Brian Peterson, Plaintiff-Appellant-Cross-Appellee,

v.

Richard P. WILLIE, individually and as Sheriff of Palm Beach County; Edwin E. Goodbread, Jr.; Earl S. Jackson; Palm Beach County Board of County Commissioners; Burr Prentice; Gail Donald, individually and as Doctors and Nurses employed by Correctional Care, Incorporated and Emergency Medical Services Associates, Incorporated, Defendants,

Correctional Care, Inc., a Florida Corporation and wholly-owned subsidiary of Emergency Medical Services Associates, Inc., a Florida Corporation; Emergency Medical Services Associates, Inc., a Florida Corporation; J. Clifford Findeiss, individually and as president of Correctional Care, Inc. and Emergency Medical Services Associates, Inc.; Lawrence Anthony, Dr.; Joyce Jopek-Peters, R.N.; and Mary Ann Irwin, R.N., individually and as a Deputy Sheriff and/or Corrections Officer of the Palm Beach Sheriff's Office and as a nurse employed by Correctional Care, Incorporated and Emergency Medical Services Associates, Incorporated, Defendants-Appellees-Cross-Appellants.

April 25, 1996.

Appeals from the United States District Court for the Southern District of Florida. (No. 90-8449Civ-JWK), James W. Kehoe, Judge.

Before COX, Circuit Judge, DYER, Senior Circuit Judge, and GOETTEL[*], Senior District Judge.

GOETTEL, Senior District Judge:

Plaintiff-appellant Brian Peterson ("Peterson") appeals from judgment entered on a jury verdict in the Southern District of Florida which did not find appellees Correctional Care, Inc., Emergency Medical Services Associates, Inc., J. Clifford Findeiss, Mary Ann Irwin, Dr. Lawrence Anthony, and Joyce Jopek-Peters (collectively "appellees") liable for injuries Peterson sustained

[*]Honorable Gerard L. Goettel, Senior U.S. District Judge for the Southern District of New York, sitting by designation.

while under appellees' care and supervision. Peterson argues that the district court erred in allowing the appellees to present the testimony of an expert witness who had been previously retained and designated as a trial witness by Peterson's original counsel, but later was discharged. Peterson also maintains that the district court erred in allowing appellees to assert his continuing ability to receive "free" medical benefits. Finally, Peterson contends that the jury's verdict was contrary to the great weight of the evidence, and that the district court erred in denying his motion for a new trial.

Appellees cross appeal, asserting that the district court erred in denying their motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. Because we affirm the district court's judgment, we need not address appellees' cross appeal.

## I. FACTS AND PROCEEDINGS BELOW

Briefly stated, the facts are as follows. Brian Peterson was a pretrial detainee at the Palm Beach County Stockade (the "facility"). Correctional Care, Inc., a wholly owned subsidiary of Emergency Medical Services Associates, Inc., was the provider of medical care for inmates at the Palm Beach County jail facilities. J. Clifford Findeiss was president of both corporations. The remaining appellees, Joyce Jopek-Peters, Mary Ann Irwin, and Dr. Lawrence Anthony were a doctor and the nurses who provided medical services to inmates at the Palm Beach County Stockade.

While Peterson was a pretrial detainee, and had been at the facility for about one month, he was assaulted by another inmate.

As a result of this incident, he sustained a brain stem injury leaving him without the ability to walk, talk, or eat any food through his mouth. He retains the ability to comprehend his surroundings.

Peterson brought a § 1983 claim against appellees and several other defendants[1] alleging that their "deliberate indifference" in providing necessary medical care and treatment constituted a violation of his constitutional rights. *See Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986). The essence of Peterson's claim was that, because of his medical condition and the appellee's failure to provide him with appropriate medical care, he appeared "retarded."[2] Appearing retarded, Peterson claims that he was subject to abuse from the general inmate population. One such incident involved the assault which caused his injuries.

Peterson asserts that it was common knowledge among the corrections and medical staff that anyone with a physical or mental disability would be a target of abuse by other inmates. To protect such inmates, it was the written policy of Correctional Care, Inc. that the mental health services coordinator would be notified if an

---

[1]Peterson settled with these other defendants prior to trial.

[2]At the time of his arrest, Peterson was suffering from Wilson's Disease. While medication exists for this disease, he had not been taking his medication regularly for a number of years. As a result, he claims that he had slurred speech, facial distortions, rigidity in his hands, and was slow in his movements. He claims his physical disabilities were obvious to anyone observing him. Appellees admit noticing Peterson's speech impediment, but deny the apparent existence of any other abnormalities. It is the alleged neglect of treatment for this disease that Peterson alleges constitutes a violation of the fifth, eighth, and fourteenth amendments to the United States Constitution.

inmate was suspected of being mentally retarded or disabled. He would then be evaluated and segregated if necessary. Peterson argues that if he had been properly treated, he would not have been the victim of the assault which caused his injuries.

After a 12 day trial, the jury returned a verdict in favor of the appellees. (Since the jury found that the appellees were not liable for Peterson's injuries, they did not return a verdict on damages.) The trial court entered judgment on the jury verdict on May 5, 1994 and denied Peterson's motion for a new trial.

## II. DISCUSSION

Two of the three issues Peterson raises on appeal deal with alleged errors at trial that relate to damages. First, he argues that the district court erred in allowing the testimony of Dr. Craig Lichtblau, an expert once retained by him but later discharged. Second, Peterson argues that the district court erred in allowing appellees to assert his continuing ability to receive "free" government medical benefits.

In reviewing both rulings, we must determine whether the district court abused its discretion. *U.S. v. Hines,* 955 F.2d 1449, 1454 (11th Cir.1992); *Sheib v. Willaims-McWilliams Co., Inc.,* 628 F.2d 509, 511 (5th Cir.1980); *Vanskike v. Union Pacific R. Co.,* 725 F.2d 1146, 1149 (8th Cir.1984). If we find that the district court erred, we must further determine whether the error was harmless. "Errors in evidentiary rulings are not grounds for reversal unless substantial prejudice results." *King v. Gulf Oil Co.,* 581 F.2d 1184, 1186 (5th Cir.1978); Fed.R.Civ.P. 61; Fed.R.Evid. 103. Statements made in oral arguments must be plainly

unwarranted and clearly injurious to constitute reversible error. *Vanskike,* 725 F.2d at 1149. While we find that the district court erred, these errors do not mandate reversal.

Peterson's former attorney retained Dr. Lichtblau, a psychiatrist, and designated him as an expert witness expected to testify at trial pursuant to Federal Rule of Civil Procedure 26(b)(4)(A)(i). Shortly before his scheduled deposition noticed by defendants and not objected to by Peterson, Dr. Lichtblau reexamined Peterson, without Peterson's attorneys' instruction or knowledge. Dr. Lichtblau then testified at the deposition that, as a result of his second examination, his opinion concerning Peterson's future placement had changed. [3] Peterson's current counsel subsequently withdrew the designation of Dr. Lichtblau as a trial expert and filed a motion in limine seeking to preclude him from testifying on behalf of the appellees. The district court later overruled Peterson's objections, and permitted Dr. Lichtblau to testify concerning his opinion as well as the fact that he had been previously retained by an attorney representing Peterson.

Peterson argues that two possible reasons motivated appellees calling Dr. Lichtblau. First, he argues that appellees sought to "buttress" the testimony of one of their other expert witnesses. As such, Peterson argues that Dr. Lichtblau's testimony was improper as merely cumulative. Appellees, of course, disagree, citing Dr. Lichtblau's superior knowledge of local facilities and

---

[3]The central economic damage issue in this case was a determination of the appropriate future medical care for Peterson. Appellees sought to show that the county home where he was currently living was satisfactory. Peterson argued that a private facility was required to adequately meet his needs.

his observations of Peterson's condition several months prior to their other expert's examination. We do not find that the district court abused its discretion in finding that Dr. Lichtblau's testimony was not merely duplicative and cumulative of appellees' other expert.

Second, Peterson argues that appellees other possible reason for calling Dr. Lichtblau was to inform the jury that Dr. Lichtblau had been originally hired by Peterson's counsel, but had been withdrawn when counsel disagreed with his opinion. Peterson argues that "[t]he coupling of his opinion testimony with the testimony that he had been hired by the Appellant, but was not utilized by the Appellant, gave the jury the ... inference ... that something was being hidden from them by Appellant's counsel." Reply Brief of Appellant and Cross-Appellee's Response Brief, p. 2-3. We agree.

Several courts have noted the prejudice that results from informing a jury that an expert had been originally consulted by the opposing party. *See, e.g., Healy v. Counts,* 100 F.R.D. 493 (D.Colo.1984). In *Granger v. Wisner,* 134 Ariz. 377, 656 P.2d 1238, 1242 (1982), the court asserted:

> Jurors unfamiliar with the role of counsel in adversary proceedings might well assume that plaintiff's counsel had suppressed evidence which he had an obligation to offer. Such a reaction could destroy counsel's credibility in the eyes of the jury.

In *Rubel v. Eli Lilly and Company,* 160 F.R.D. 458, 460 (S.D.N.Y.1995), the court, quoting 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure: Civil § 2032, at 447 (1994), described this prejudicial fact as "explosive."

Courts have differed in their approach to such situations. Some have permitted a party to call a witness originally consulted by the opposing party, but prohibited the party from offering evidence that the witness had been previously consulted by the opposing party. *See, e.g., Granger,* 656 P.2d 1238; *Sun Charm Ranch, Inc. v. City of Orlando,* 407 So.2d 938 (Fla. 5th DCA, 1981). This approach may inhibit adequate cross examination. *See Granger,* 656 P.2d at 1243, where the court noted, "[c]ross-examination is a difficult art which is not made easier when counsel must perform it on a tightrope." Other courts have refused to permit the expert to testify at all absent a showing of need. *See, e.g., Rubel,* 160 F.R.D. 458. Relying on these cases, Peterson argues that, at the very least, the district court erred in permitting the appellees to elicit from Dr. Lichtblau the fact that he had been previously retained by an attorney representing Peterson.

Appellees distinguish the above cases, arguing that none of these cases dealt with expert witnesses expected to be called at trial. Unlike the experts in the cases above who were merely consulted in preparation for trial, Dr. Lichtblau was actually designated as a Rule 26(b)(4)(A)(i) witness expected to testify at trial. Appellees cite *Broward County v. Cento,* 611 So.2d 1339 (Fla. 4th DCA, 1993), in support of their position that this difference is material.

While appellees are correct that the cases cited by Peterson do not address this difference, we do not find this difference controlling in all respects. Once a witness has been designated as expected to testify at trial, there may be situations when the

witness should be permitted to testify for the opposing party.[4] In such situations, however, we believe that a party should not generally be permitted to establish that the witness had been previously retained by the opposing party. While there may be situations where this fact should be disclosed to a jury, [5] we believe that the unfair prejudice resulting from disclosing this fact usually outweighs any probative value. Here, we find that the district court erred in permitting the appellees' counsel to elicit the fact that Dr. Lichtblau had been previously retained by an attorney representing Peterson.[6]

While recognizing this error, we do not find here that it rises to the level of substantial prejudice mandating a reversal of the district court's judgment. *See U.S. v. Killough,* 848 F.2d 1523, 1527 (11th Cir.1988). At trial, Peterson's counsel twice

---

[4]This decision is committed to the sound discretion of the district court. While it may generally be possible to permit a party to call a witness without disclosing the fact of his or her prior engagement by the opposing party, there may be little reason to require this effort if other expert witnesses are readily available. *See Rubel,* 160 F.R.D. at 461.

[5]One such situation may be if on cross examination, the party who had originally retained the witness seeks to attack the expert's qualifications. In such a situation, a court may well decide that the opposing party should be permitted to attempt to rehabilitate the witness by eliciting testimony from the witness that the party had thought highly enough of the witness to consult him or her originally. *See Granger,* 656 P.2d at 1242, & n. 4 (recognizing but not resolving this question).

[6]On direct examination, appellees' counsel questioned Dr. Lichtblau as to how it came about that he had evaluated Brian Peterson. Dr. Lichtblau stated that he was hired by "an attorney" who asked him to determine what the appropriate level of care was for the patient. Appellees' counsel purposefully elicited the fact that Dr. Lichtblau had been originally retained by Peterson's counsel with his next question: "By an attorney representing Mr. Peterson?" Dr. Lichtblau responded, "That is correct." R 12-208.

informed the jury that Dr. Lichtblau had not been hired by them, but rather by Peterson's former counsel.  This somewhat neutralized the possible prejudice caused by the disclosure of Dr. Lichtblau's prior retention.  Moreover, Dr. Lichtblau was essentially a damage witness.  Therefore, while we find error in the district court's admission of evidence concerning Dr. Lichtblau's prior retention, we hold that this error did not so prejudice Peterson's rights as to mandate a reversal.  *U.S. v. Killough,* 848 F.2d at 1527.

The evidence at trial supports the jury's verdict that appellees were not liable for Peterson's injuries.  The alleged lack of care provided to Peterson's medical condition while at the facility does not appear to rise to the level of "deliberate indifference" necessary to constitute a violation of his constitutional rights.  See *Murrell v. Bennett,* 615 F.2d 306, 310 n. 4 (5th Cir.1980), stating that deliberate indifference exists when "the questioned conduct is cruel and unusual because it involves deliberate indifference, or something more than a medical judgment call, an accident, or an inadvertent failure."

Peterson argues that the appellees' failure to properly treat and classify him constitutes deliberate indifference to his constitutional right to receive adequate medical treatment while being incarcerated since, although Peterson informed appellees that he had Wilson's Disease and requested medication, he was not provided with it.  The medication for Wilson's Disease, Cuprimine, is a toxic drug which can be very dangerous if not appropriately given.  Testimony at trial supports the appellees' position that a delay in giving the medication would not be dangerous, and that,

indeed, it would be prudent to check with a treating physician before administering such medication. That is exactly what occurred; after examining Peterson, Dr. Anthony instructed the nursing personnel to obtain medical authorization for the release of Peterson's treating neurologist's medical records. The facility did not receive the records prior to Peterson's injuries.

In addition, the evidence supports a determination that any deficiency in supplying medication was not the proximate cause of Peterson's injuries. Peterson was assaulted by inmate Corey Phoenix. The assault does not appear to have been caused by Peterson's medical condition (appearing retarded because of his slurred speech and drooling). Instead, the assault was caused by a joke that got out of hand.[7] Even if the assault was partially motivated by Peterson's medical condition, evidence presented at trial supports the appellees' contention that the administering of the medicine would not have immediately changed Peterson's appearance. Peterson's expert admitted that improvements in neurological manifestations would not be observable for at least six months following administration of the medication. Even if Peterson had been immediately medicated upon admittance to the

---

[7]Peterson and Phoenix shared bunk beds in their dormitory. Phoenix testified that the two were friends, and that he liked to play cards with Peterson. On June 14, 1987, Peterson, who slept on the top bunk, was picking lint off a blanket and tossing it on Phoenix's card game below. In retaliation, when Peterson got up to get a drink of water, Phoenix took Peterson's blanket and mattress off the bed and threw them out in the middle of the aisle. When Peterson returned, he walked up to Phoenix and Phoenix pushed Peterson. Peterson then charged Phoenix, and Phoenix struck him. Peterson fell and hit his head on the concrete floor. Phoenix testified that Peterson's abnormalities had nothing to do with the altercation. He testified that it was a joke that got carried too far.

facility, he would have still exhibited the symptoms which he claims caused the assault a month later. The evidence, therefore, establishes that any alleged lack of medical treatment was not the proximate cause of Peterson's injuries.

Peterson also argues that he should have been segregated from the general inmate population because of the risk that his symptoms would lead to abuse. While there is dispute over exactly what symptoms Peterson exhibited, the most obvious was his slowed, slurred, and/or halting speech. Peterson's own correctional health care expert agreed that this alone is not cause to segregate an inmate from the general population. Peterson contends, however, that other symptoms existed (facial distortions, rigidity in his hands, and a general slowness in his movements) that cumulatively were cause to segregate him. Appellees deny any notice of these other symptoms. They note that no deputies or guards during Peterson's thirty-four day stay at the facility reported seeing these abnormalities or that he was the subject of taunting or abuse. This evidence supports a determination that appellees' failure to segregate Peterson does not rise to the level of deliberate indifference to his constitutional rights.

Peterson further argues that the district court erred in permitting appellees to assert his continuing ability to receive government provided medical benefits at no cost to him.[8] While the parties discuss Florida's collateral source rule and its

---

[8]Because we find that these misrepresentations were not "clearly injurious," we need not address whether Peterson adequately preserved this issue for appeal. *See Vanskike,* 725 F.2d at 1149.

application to the admission of this evidence, this is not a collateral source issue. There is no dispute that the medical care available to Florida's indigents is admissible.[9]

The dispute arises because of appellees' counsels' statements to the jury that Peterson's future medical care would be "free" or at "no cost" to him. At trial, Peterson did not seek damages for past expenses (which had been provided by Medicaid), but rather only for future expenses. Because of his pretrial settlement with other defendants, he was no longer eligible for Medicaid benefits[10] and his medical expenses would no longer be provided by Medicaid, at no cost to him. Despite this fact, appellees' counsel several times stated to the jury that Peterson's medical care was and would be free to him.[11]

Appellees' counsels' attempt to justify these statements is

[9]We have previously addressed Florida's exception to the collateral source rule in a 1983 action in *Carswell v. Bay County,* 854 F.2d 454 (11th Cir.1988). Under this exception, "governmental or charitable benefits available to all citizens, regardless of wealth or status, should be admissible for the jury to consider in determining the reasonable cost of necessary future care." *Florida Physician's Insurance Reciprocal v. Stanley,* 452 So.2d 514, 515 (Fla.1984).

[10]Prior to the trial, Peterson settled with several defendants for $2.75 million. Medicaid benefits are only available to those meeting the asset test set forth in 20 C.F.R. § 416.1205. As a result of the settlement, Peterson's assets greatly exceeded the eligibility limits.

[11]In appellees' opening statement at trial, attorney Bruce M. Ramsey stated that Peterson's care in the county home "doesn't cost him anything." R. 8-40. While questioning a witness, appellees' attorney Hayward D. Gay referred to Peterson's "so-called free care" in the county home. R. 11-100. Additionally, in closing argument, Mr. Gay described Peterson's medical care stating, "He doesn't pay a nickel. He never has and he never will." R. 15-106. Referring to another facility where Medicaid would be accepted, Mr. Gay stated that Peterson could live there "at no cost to him or anybody else." *Id.*

unpersuasive. While they admit that the settlement would currently deprive Peterson of Medicaid benefits, they argue that because his projected future care costs greatly exceed the settlement funds, he will be entitled to these benefits again in the future. Even if this could occur, it does not excuse counsels' blanket statements that Peterson will never be required to pay for his medical care.

We recognize the problem presented to appellees' trial strategy by virtue of the settlement. Appellees were obviously not permitted to inform the jury of the settlement. Additionally, their strong argument—that certain damages need not be awarded to Peterson because Medicaid benefits would provide for his medical care—was no longer true. In such a situation, an appropriate response would have been to seek an extension of time to prepare another defense. It was not appropriate, however, to lie to the jury.

Aware of the settlement and the falsity of their words, appellees' counsel misinformed the jury that Peterson would not have to pay for his continued medical care. We strongly disapprove of this behavior. Reversal of the district court's judgment, however, is not warranted. This error relates solely to the issue of damages. The jury did not reach the issue of damages because it found that the appellees were not liable for Peterson's injuries.

Recognizing this obstacle, Peterson argues:

> The message was ... sent to the jury that Brian Peterson would always be properly cared, for "free," and thus there was no need to give an award against the Appellee for this aspect of damages. Appellee's strategy thereby transcends the damage issue and impacts (or "spills over") on the determination of liability.

Initial Brief of Appellant, p. 24. We recognize that in some

situations, errors relating to damages may "spill over" into a jury's determination of liability. *See, e.g., City of Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749, 759 (6th Cir.1980) (holding that "since the jury was prejudiced with respect to its award of damages, it cannot be said that its finding of liability was free from prejudice."). Here, however, we find no evidence of "spill over." Approximately half of the fifteen million dollars in damages sought by Peterson at trial were for pain and suffering, rather than future medical expenses. As appellees suggest, it is unlikely that the jury was so misled by evidence of the availability of free future medical care that it ignored Peterson's equal claim for pain and suffering. Rather, the jury likely found no deliberate indifference on behalf of appellees that was the proximate cause of the damages suffered by Peterson.

Finally, we briefly address the district court's denial of Peterson's motion for a new trial. We review the district court's decision for abuse of discretion, *see, Insurance Co. of North America v. Valente,* 933 F.2d 921, 922 (11th Cir.1991), mindful that in order to:

> assure that the judge does not simply substitute his judgment for that of the jury, ... we have noted that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.

*Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir.1984) (citations omitted). Peterson's argument that the verdict was contrary to the great weight of the evidence fails to meet this heavy burden. We find ample evidence in the record, during 12 days of trial, to support the district court's denial of a motion for a

new trial.  The district court did not abuse its discretions in denying Peterson's motion.

## III. CONCLUSION

For the above reasons, we AFFIRM the judgment of the United States District Court for the Southern District of Florida.