24CA1491 Miolen v Hathcock 01-29-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1491
Larimer County District Court No. 20CV30635
Honorable C. Michelle Brinegar, Judge

Michael Miolen,

Plaintiff-Appellant,

v.

Alan Hathcock, M.D., and Poudre Valley Health Care, Inc. d/b/a UCHealth
Harmony Emergency Center,

Defendants-Appellees.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Kuhn and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 29, 2026

Leventhal Puga Braley P.C., Jim Leventhal, Julia T. Thompson, Nathaniel E.
Deakins, Robert S. Peck, Denver, Colorado, for Plaintiff-Appellant

Hershey Decker Drake PLLC, C. Todd Drake, Lone Tree, Colorado, for
Defendants-Appellees

Faraci Leasure, LLC, Paul A. Faraci, Glendale, Colorado, for Defendant-
Appellee Alan Hathcock, M.D.

Jackson Kelly PLLC, Gilbert Dickinson, Denver, Colorado, for Defendant-
Appellee Poudre Valley Health Care, Inc. d/b/a UCHealth Harmony Emergency
Center

¶ 1    After Michael Miolen suffered a heart attack, he sued Dr. Derek Stadie, Alan Hathcock, M.D., and Poudre Valley Health Care, Inc. d/b/a UCHealth Harmony Emergency Center (Harmony) for their allegedly negligent conduct in treating his condition.[1]  A jury rejected Miolen's allegations of negligence, and he now appeals.  We affirm.

## I.    Background

¶ 2    In September 2018, Miolen went to Harmony, a freestanding emergency department in Fort Collins, believing he was having a heart attack.  After he arrived, Stadie, an emergency medicine physician, ordered an electrocardiogram (EKG) at 12:46 a.m.  Stadie described the results of this EKG as not entirely normal.  The EKG machine indicated that Miolen was having a myocardial infarction (a heart attack), but Stadie disagreed with the machine's interpretation.  Miolen remained at Harmony, and Stadie ordered a second EKG at 3:04 a.m.  Stadie then spoke to Hathcock, an internal medicine doctor at Poudre Valley Hospital (PVH), and

---

[1] Stadie settled with Miolen in 2023 and was no longer a party at the time of trial.  However, Miolen and Harmony designated Stadie as a nonparty at fault.

arranged for Miolen's transfer to PVH for cardiac monitoring and other treatment unavailable at Harmony. PVH is a nearby hospital that is part of the same medical system as Harmony.

¶ 3    Miolen arrived at PVH at approximately 4:45 a.m., and Hathcock took over his care. At around 7 a.m., Dr. Roger Ashmore, an in-house cardiologist, arrived at PVH. He was soon consulted about Miolen's condition, reviewed Miolen's medical chart and prior EKGs, and ordered a third EKG at 8 a.m. Ashmore testified that the results of the third EKG showed a more significant injury to Miolen's heart, so he called an alert to initiate emergency catheterization.

¶ 4    Miolen received treatment for the heart attack and was discharged from the hospital two days later. However, he was unable to return to his normal level of physical activity, required ongoing treatment, and anticipated he would need a heart transplant in the future. A cardiologist who treated Miolen after the heart attack also testified that Miolen's heart was not functioning at maximum capacity and that more than 50% of his heart was "either damaged . . . or [was] not working well."

¶ 5     In 2020, Miolen sued Stadie, Hathcock, and Harmony, alleging that their negligence in failing to consult a cardiologist and transfer him to PVH sooner caused him to sustain more significant and permanent injuries.  After an eleven-day trial in April 2024, a jury found that Hathcock and Harmony did not act negligently.

## A.     Procedural History

¶ 6     On November 10, 2021, the day of Miolen's expert witness disclosure deadline, he disclosed — as relevant here — Ashmore as a nonretained expert to testify about his care and treatment of Miolen at PVH.  At a discovery hearing on February 3, 2022, the district court continued the trial originally scheduled for February 28, 2022, but it did not reopen discovery other than as discussed at that discovery hearing.  Trial was rescheduled to July 2023 and later to April 2024.  On February 8, 2022, Ashmore first met with Miolen's counsel, and two days later Miolen filed a supplemental expert disclosure expanding the scope of Ashmore's proposed testimony.

¶ 7     During a March 2, 2022, hearing to discuss the supplemental disclosure, Hathcock's counsel admitted that he previously met with Ashmore and received some of the same information contained

3

in Miolen's supplemental disclosure.  But he said he did not discuss the meeting with counsel for the other defendants.  Collectively, the defendants opposed the supplemental disclosure as untimely, beyond the scope of Ashmore's factual involvement, and duplicative of other experts' opinions.  The district court precluded the evidence described in the supplemental disclosure, concluding that allowing the testimony at trial would prejudice the defendants.  However, because Ashmore's deposition had not yet occurred, the district court allowed Miolen's counsel to ask about the opinions in the supplemental disclosure during the deposition "for the purpose solely of . . . developing an appellate record."  Miolen later moved for reconsideration of the court's order precluding Ashmore's testimony, and the court reaffirmed its original order.

¶ 8        Before further discussing the discovery dispute, additional context surrounding Miolen's treatment and the issues at trial is helpful.  One of the primary disputes was whether, before he arrived at PVH, Miolen was having a certain type of heart attack called an ST-segment elevation myocardial infarction (STEMI) that requires

emergency catheterization.[2]  The defendants' theory was that Miolen's EKGs did not meet STEMI criteria until the 8 a.m. EKG at PVH, after which he was promptly taken to the catheterization lab. Therefore, the defendants argued that Miolen's first two EKGs did not warrant an emergency transfer to PVH's catheterization lab. Conversely, Miolen's theory was that (1) he had a STEMI before the 8 a.m. EKG; (2) his providers should have consulted a cardiologist sooner; and (3) he should have been transferred to PVH's catheterization lab sooner.  The delay in treatment, he argued, was negligent.

¶ 9     According to the supplemental disclosure, Ashmore would testify that a cardiologist could have and should have been called while Miolen was at Harmony.  The disclosure also stated Ashmore's opinion that Miolen should have been transferred to PVH for monitoring after the 12:46 a.m. EKG.  And it described Ashmore's opinion that Miolen's 3:04 a.m. EKG met STEMI criteria and warranted immediate transfer to the catheterization lab.

---

[2] The ST segment on an EKG shows electrical activity in the heart, and ST elevation can indicate blocked blood flow to the heart or decreased electrical activity.

Ashmore would testify that Miolen likely would have sustained a milder injury had this course of treatment occurred.

¶ 10    Despite originally precluding Ashmore's testimony on the topics in the untimely supplemental disclosure, the court allowed Ashmore to testify about his treatment and interpretation of the 12:46 and 3:04 EKGs but precluded testimony about what he would have done — or someone else should have done — after reviewing the two EKGs. Ashmore testified that a STEMI requires a certain amount of ST elevation in at least two contiguous leads on an EKG, and he testified that the 12:46 EKG showed ST elevation in one lead, which he believed showed "a possible injury." He also testified that the 3:04 EKG showed ST elevation in two leads sufficient to meet STEMI criteria.

## B.    Issues on Appeal

¶ 11    Miolen now appeals, arguing that the district court erroneously precluded some of Ashmore's testimony contained in the supplemental disclosure. His opening brief argues extensively that the district court erred but fails to explain whether or how any such error prejudiced him. And his reply brief dedicates a cursory two paragraphs to the argument that the alleged error was not

harmless.  We do not address his myriad arguments alleging error because we conclude that — even assuming error occurred — any error was harmless.

¶ 12     We also do not address Miolen's arguments that the court should have admitted Ashmore's testimony because precluding it allowed Ashmore to be treated as a nonparty at fault and violated due process.  Miolen does not point us to where he preserved this argument, *see* C.A.R. 28(a)(7)(A), and our independent review of the record did not reveal any such argument.  Moreover, Miolen's counsel objected on speculation grounds to the testimony that supposedly rendered Ashmore a nonparty at fault.  Because Miolen's arguments on appeal were not presented to the district court, we do not consider them.  *See Gestner v. Gestner*, 2024 COA 55, ¶ 18.

¶ 13     Finally, we address Miolen's attorney fees appeal in a separate opinion.  *See Miolen v. Hathcock*, (Colo. App. No. 25CA0055, Jan. 29, 2026) (not published pursuant to C.A.R. 35(e)).

## II.   Analysis

### A.   Standard of Review and Applicable Law

¶ 14   We review a district court's decision to admit or exclude evidence for an abuse of discretion. *D.R. Horton, Inc.-Denv. v. Bischof & Coffman Constr., LLC*, 217 P.3d 1262, 1267 (Colo. App. 2009). This includes a decision to admit or exclude evidence and witnesses that were not timely disclosed. *See id.; Melssen v. Auto-Owners Ins. Co.*, 2012 COA 102, ¶ 52. A district court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair. *D.R. Horton, Inc.-Denv.*, 217 P.3d at 1267.

¶ 15   Unless certain exceptions apply, a district court may — under C.R.C.P. 37(c) — sanction a party's failure to comply with certain discovery deadlines by precluding evidence or witnesses. *Berry v. Keltner*, 208 P.3d 247, 248 (Colo. 2009). The erroneous admission or preclusion of evidence is harmless and does not warrant reversal unless "it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself." *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010) (citation omitted). Moreover, "[i]f evidence that [wa]s excluded was also presented through other testimony or admitted

8

evidence, any error in excluding the cumulative evidence is harmless . . . ." *Sovde v. Scott*, 2017 COA 90, ¶ 65 (citation omitted) (concluding that the plaintiff was not prejudiced by the district court's exclusion of testimony from one witness that was admitted through other witnesses).

## B.    Application

¶ 16    Miolen appears to concede that his supplemental disclosure was untimely, but he primarily challenges the district court's conclusion that admitting Ashmore's testimony described in the disclosure would prejudice the defendants.  His opening brief does not explain whether or how the preclusion of Ashmore's testimony prejudiced *him*.  *See Bly*, 241 P.3d at 535.  His reply brief argues primarily that *Baker v. Taco Bell Corp.*, 163 F.R.D. 348 (D. Colo. 1995), supports a conclusion that excluding such testimony is not harmless because treating physicians bring a unique perspective that is not duplicative of other witnesses' testimony.  That case considered whether treating physicians were experts under the federal rules of civil procedure such that the plaintiff could recover certain litigation costs; it did not consider whether a treating

physician's testimony may be more persuasive to a jury than a retained expert. *Id.* at 349.

¶ 17     Because Miolen does not clearly articulate which portions of the precluded testimony prejudiced him, we consider all of Ashmore's proffered testimony from the supplemental disclosure. We then explain that each statement in the disclosure was elicited at trial through Ashmore or other witnesses. Therefore, we conclude that the district court either did not preclude Ashmore's testimony or that any error in precluding parts of his testimony was harmless. *See Scott,* ¶ 65; *Simon v. Truck Ins. Exch.,* 757 P.2d 1123, 1125 (Colo. App. 1988) (excluding proffered testimony was harmless when it "would have been cumulative of that of another expert for [the] plaintiff").

¶ 18     The supplemental disclosure first stated that Ashmore was a cardiologist who treated Miolen at PVH, and Ashmore would testify

about his care, treatment, and evaluation of Miolen.[3] As discussed, the court allowed this testimony.

¶ 19    Next, the disclosure stated that Ashmore would testify that he met with Miolen's and Hathcock's counsel before trial. This testimony seems more foundational than relevant to the ultimate issue of whether Miolen's providers were negligent. And on appeal, Miolen primarily cites Ashmore's meeting with Hathcock's counsel to argue that at least one defendant was aware of Ashmore's opinions detailed in the supplemental disclosure and would not have been prejudiced. But we do not see how excluding this testimony could have substantially influenced the trial's outcome. *Bly*, 241 P.3d at 535.

¶ 20    Turning to the more substantive parts of the disclosure, it next stated that "Ashmore will testify that he read the 12:46 EKG after Mr. Miolen had been transferred for inpatient care at PVH. He will

---

[3] The disclosure also stated that Ashmore would testify that "[t]roponin results are automatically imported into the patient record once a point of care test is run." It is unclear whether the district court precluded this testimony, and Miolen references this proffer only in his summary of the disclosure. But a witness testified that troponin results go from the testing device, "up into the cloud, and then download[] into the patient's chart."

testify that [the] 12:46 EKG [was] abnormal. The most concerning aspect of the 12:46 EKG [was] an ST elevation in lead V3." Ashmore testified that this EKG showed "ST elevation in lead V3, and that's the area where [he] thought there was concern for possible injury." Dr. Mark Langdorf, Miolen's retained expert, also testified that the 12:46 EKG was abnormal. And even Stadie testified that the first EKG was not "completely normal."

¶ 21 The next part of the disclosure also seemingly pertained to the 12:46 EKG and stated that "Ashmore will testify that when a patient presents to the [emergency room] and his EKG or clinical presentation is unclear, such as Mr. Miolen's, a cardiologist could have been called for an urgent consultation. Those types of consultations are not infrequent." Stadie testified that Harmony policy required a cardiology consult if a patient's EKG results were unclear. However, there was some dispute about whether Miolen's EKG results were unclear or merely irregular. Stadie explained that he interpreted the policy to require a cardiology consult if it was unclear whether the patient's EKG met STEMI criteria, and he testified that Miolen's 12:46 EKG clearly did not meet that criteria.

12

However, he admitted on cross-examination that he testified in his deposition that the 12:46 EKG results were unclear.

¶ 22 Two of Miolen's expert witnesses also discussed Harmony's policy and testified that a cardiology consult should have occurred even if the 12:46 EKG did not meet STEMI criteria. There was also no real dispute that a cardiologist *could* have been called; Hathcock and Ashmore testified that, at all times, PVH has a board-certified cardiologist on call and available for consultation. Overall, there was testimony that a cardiologist could have been consulted, that an unclear EKG warrants a consult, and two experts testified that the 12:46 EKG warranted such a consult. *See Scott,* ¶ 65.

¶ 23 Miolen's disclosure also proffered Ashmore's testimony that no cardiology consult occurred before Miolen was transferred to PVH. This did not appear to be disputed; Stadie testified that he did not consult a cardiologist and admitted that he and Hathcock never discussed a cardiology consult. Hathcock also testified that he never recommended a cardiology consult. Further, Langdorf, Miolen's expert, testified that no cardiology consult occurred and opined that it constituted substandard medical care.

¶ 24    The disclosure next discussed Ashmore's testimony about what he would have done had he been consulted after the first two EKGs.  The district court explicitly precluded this evidence, which would have included Ashmore's testimony that "had he been consulted after 12:46, he would have directed that Mr. Miolen be taken to PVH for hospital admission and close monitoring, serial [troponin tests] and serial EKGS."  But one of Miolen's other experts gave testimony nearly identical to Miolen's proffer: "If they had a cardiologist consult at [12:46], the cardiologist likely would have recommended immediate transfer, repeat EKGs, and serial troponins."

¶ 25    Moreover, what Ashmore would have done had he been consulted after the initial EKG was less relevant than whether Miolen's EKG results should have triggered a cardiologist consultation in the first place.  This is because the main issue was whether Miolen's providers negligently delayed care by failing to consult a cardiologist earlier, not what a cardiologist would have done after being consulted.  There appeared to be broad consensus among both parties' witnesses that the 12:46 EKG did not meet STEMI criteria.  So the question was whether a cardiology consult

14

should have occurred even if it did not meet STEMI criteria. The jury heard testimony from Miolen's other experts that a cardiologist should have been consulted, and the failure to do so constituted substandard care. Therefore, any error in excluding Ashmore's testimony about what he would have done had he been consulted after the 12:46 EKG was harmless. *See Scott*, ¶ 65.

¶ 26 Turning to the second EKG, the disclosure said that Ashmore would testify that he reviewed the 3:04 EKG after Miolen was transferred to PVH, and the "EKG contained [two] contiguous leads with ST segment elevation in V3 and V4 and did meet STEMI criteria." At trial, Ashmore testified about his interpretation of the 3:04 EKG and said it met STEMI criteria. Langdorf also testified that the second EKG did not "meet classic STEMI criteria" but still showed evidence of a STEMI. This testimony was not precluded.

¶ 27 Similarly, the disclosure indicated that Ashmore would testify that, after the second EKG, "a cardiology consult was warranted, and Mr. Miolen should have been immediately transferred to PVH." For several reasons, we conclude that excluding this testimony was harmless. First, the jury heard extensive consensus among both parties' witnesses that a cardiology consult and transfer are

15

necessary if an EKG meets STEMI criteria. The primary dispute was whether Miolen's 3:04 EKG showed a STEMI or, if not, whether the standard of care still required a cardiology consult and transfer to PVH. But the jury heard the critical part of Ashmore's testimony, which was his opinion that the 3:04 EKG met STEMI criteria. Given the broad consensus on proper STEMI protocol, this testimony necessarily suggested he also believed a cardiology consult and transfer were warranted.

¶ 28    Langdorf and another expert witness also directly testified that the 3:04 a.m. EKG warranted a cardiology consult and immediate transfer and that delaying this care was improper. Therefore, the jury heard evidence from Ashmore implying that a cardiology consult and transfer were necessary, and it heard the proffered evidence directly from two other witnesses.

¶ 29    Next, the disclosure indicated that Ashmore would have testified that had Miolen been transferred to PVH after his second EKG, he "would have arrived at the cath[eterization] lab within [thirty] minutes from [Harmony] where an angiogram followed by revascularization would have occurred," and he likely would have sustained a milder injury. The jury heard evidence about how long

16

it took to drive from Harmony to PVH and about how long it took to transfer Miolen to the catheterization lab after the 8 a.m. EKG. We think it extremely unlikely that the jury's liability conclusion would have been affected by Ashmore's testimony that it would have taken thirty minutes at 3 a.m. to transfer Miolen from Harmony to the PVH catheterization lab.

¶ 30    The excluded testimony related to a hypothetical situation in which Miolen would have been transferred to the catheterization lab around 3 a.m., but the actual transfer occurred approximately five hours later. What *could* have happened at 3 a.m. (including the potential transfer time) was not particularly relevant to whether he *should* have been transferred then. And while the proffered timeframe may have helped the jury assess the amount of preventable damage to Miolen's heart, this evidence was less relevant to the issue of whether his providers negligently delayed care (a conclusion that the jury rejected). *See Dunlap v. Long*, 902 P.2d 446, 448 (Colo. App. 1995) (explaining that a jury determination rejecting liability "renders harmless any error that might have occurred with respect to the issue of the plaintiff's alleged damages"). In fact, the jury concluded that Miolen did

17

suffer "injuries[,] damages[,] or losses" but rejected the conclusion that Hathcock or Harmony *caused* those damages.

¶ 31   The same reasoning applies to Ashmore's proffered testimony that Miolen would have sustained a milder injury if he had been transferred after the second EKG. Again, this testimony was more relevant to the extent of Miolen's injuries than whether his providers breached the standard of care by delaying care. And the jury heard that Ashmore interpreted the 3:04 EKG as showing a STEMI, which implied that an emergent transfer was necessary. Had the jury accepted Ashmore's interpretation, it was a matter of common sense that Miolen would have sustained a milder injury if he were transferred earlier. But the jury's verdict suggests that it rejected Ashmore's opinion that the second EKG showed a STEMI.

¶ 32   Furthermore, two other experts testified that Miolen would not have sustained as serious an injury if he had been transferred earlier and that delaying care increased the severity of his injury. We cannot say that precluding Ashmore's testimony substantially influenced the outcome of the case when other experts gave identical testimony, *see Simon*, 757 P.2d at 1125, and when the jury apparently rejected the portion of Ashmore's and the other

18

experts' testimony suggesting that failure to initiate an earlier transfer was negligent.

¶ 33 We are also not persuaded that the jury would have given Ashmore's testimony as a nonretained expert and treating physician more weight than Miolen's retained experts (at least to an extent that would have substantially influenced the trial's outcome). *See Gonzales v. Windlan*, 2014 COA 176, ¶ 34 (rejecting the argument that a doctor's testimony "'carried extra weight with the jury' because he was Gonzales's primary care physician"). First, Ashmore was not the on-call cardiologist at the time of the first or second EKGs, so testimony about what he would have done was even more attenuated than if he had been on call. And, as discussed, the jury heard Ashmore's testimony that the 3:04 EKG showed a STEMI. It was undisputed that a STEMI triggers a cardiology consultation and a transfer to the catheterization lab. Had the jury found Ashmore's STEMI conclusion credible, it logically followed that Miolen should have been transferred earlier and that delaying treatment breached the standard of care.

¶ 34 But the jury appears to have rejected Ashmore's conclusion, which may have been because Ashmore defined STEMI criteria

differently than the other witnesses, including Miolen's expert witnesses. Hathcock's counsel emphasized this during closing arguments. Therefore, even if Ashmore had testified to everything in the supplemental disclosure, the jury may have given *less* weight to some of his testimony because he used a different diagnostic method than the other experts.

¶ 35　Finally, we are not persuaded by Miolen's argument that Ashmore's testimony would have been more persuasive because he worked for the Poudre Valley Healthcare hospital system and was more familiar with the specific policies and procedures. For one, as a PVH cardiologist, Ashmore was responsible for responding to, not initiating, cardiology consultations from Harmony. Additionally, Miolen's other expert witnesses reviewed and testified about Harmony's cardiac alert policy, which guided Harmony staff on whether and when to consult with a cardiologist. Ashmore's familiarity with this policy would have perhaps given the jury additional context, but the jury had access to the policy itself and heard various witnesses testify about that policy.

¶ 36　In sum, we conclude that any error in excluding portions of Ashmore's testimony from Miolen's untimely supplemental

disclosure was harmless. The jury heard nearly all the proffered testimony from Ashmore himself or other witnesses. *See Scott*, ¶ 65; *Simon*, 757 P.2d at 1125. We think it highly unlikely that Ashmore's inability to testify directly about each item listed in the disclosure "substantially influenced the outcome of the case or impaired the basic fairness of the trial itself." *Bly*, 241 P.3d at 535 (citation omitted).

## III. Disposition

¶ 37     The judgment against Miolen and in favor of Hathcock and Harmony is affirmed.

JUDGE KUHN and JUDGE SULLIVAN concur.